Argued and submitted October 20, 2011, affirmed April 25, petition for review denied August 16, 2012 (352 Or 341)

AWBREY TOWERS, LLC,
an Oregon limited liability company,
*Plaintiff-Respondent,*

*v.*

WESTERN RADIO SERVICES, INC.,
an Oregon corporation,
*Defendant-Appellant.*

Deschutes County Circuit Court
05CV0488ST; A140840

278 P3d 44

Marianne Dugan argued the cause and filed the briefs for appellant.

Terrence B. O'Sullivan argued the cause for respondent. With him on the brief was Merrill O'Sullivan, LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Plaintiff, a limited liability company (LLC), brought this action against one of its members, defendant Western Radio Services, Inc., alleging that defendant had breached its obligation to make capital contributions as required by the LLC's operating agreement. Following a bench trial, the trial court entered judgment in plaintiff's favor, awarding it $51,310.28 plus costs and interest, and the court later entered a supplemental judgment awarding plaintiff its attorney fees.[1] Defendant raises a multitude of arguments on appeal, most of which we reject without discussion. On the merits, we write only to address defendant's argument that the requests for capital contributions (referred to as "capital calls") were invalid because, among other things, they benefitted only individual members (not the LLC) and they were not properly approved by the members. We also address defendant's argument that the trial court erred in awarding plaintiff its attorney fees. For the reasons set out below, we affirm.

Because this is a suit for contract damages, it is an action at law, and we are bound by the trial court's findings if they are supported by any evidence in the record. *McClory v. Gay*, 45 Or App 561, 563, 608 P2d 1213 (1980). For purposes of this appeal, the facts are largely undisputed. We describe them in some detail, as they inform our analysis of defendant's arguments about the propriety of the capital calls.

This case centers on the operation of a 19-acre parcel of land on Awbrey Butte, which is located in Bend. All of plaintiff LLC's seven members, including defendant, now own communication towers located on that site. The towers serve a variety of purposes, including cellular-telephone service and radio and television broadcasting. Before plaintiff

---

[1] The judgment awarding plaintiff's damages is labeled "Limited Judgment." It should have been labeled as a general judgment. *See* ORS 18.005(7) (a general judgment is one that decides all requests for relief in the action except requests previously decided by a limited judgment or requests that may be decided by a supplemental judgment); ORCP 68 C(5)(b) (attorney fees may be awarded by supplemental judgment). The labeling defect is not fatal to defendant's appeal. *See Berg and Berg*, 211 Or App 703, 706 n 2, 156 P3d 171 (2007) ("[T]he mislabeling of a judgment does not mean that the mislabeled judgment is not appealable.").

was organized, only six prospective LLC members had towers on Awbrey Butte, and each of those entities leased the land underlying its facilities from Deschutes County. The seventh entity, The Chackel Family, LLC (Chackel) did not then own a tower, but it leased space for broadcasting equipment on the towers of two other members, including Oregon Public Broadcasting (OPB). Beginning around 1999, Chackel sought to construct a tower of its own on Awbrey Butte. The Awbrey Butte parcel is zoned for residential use, and radio and television broadcasting facilities may not be operated there without a conditional use permit from the City of Bend. Accordingly, Chackel hired a law firm to help it apply for a conditional use permit.

In 1999, the seven prospective LLC members decided to organize plaintiff LLC to purchase the Awbrey Butte property from Deschutes County. Plaintiff was organized in June 2000 and purchased the property shortly thereafter. Since then, each tower owner has leased the land underlying its facility from plaintiff.

In September 2000, the LLC members entered into an operating agreement, which states that the LLC's purposes are to "[a]cquire, own and operate an antenna site on Awbrey Butte in Bend, Oregon ('Tower Site')" and to "[e]ngage in such other activities as are related or incidental to the foregoing purpose and such additional purposes as may be determined from time to time by the Members." The agreement also provides that each member "will retain the ownership of its own tower and any buildings supporting its tower operations" and "will be responsible at its own expense for maintaining its Improvements in a clean and orderly manner and in accordance with all federal, state and local statutes, ordinances or regulations that may apply." With respect to capital contributions, the agreement provides that, after an initial contribution, the members "shall make additional Capital Contributions to the Company from time to time as may be necessary to service any debt incurred in connection with the acquisition of the Tower Site and such additional capital needs of the Company as determined by a vote of the Members."

The LLC members adopted a resolution delegating certain management responsibilities to two member representatives, Terry Cowan (who performed accounting functions) and James DeChant (who acted as secretary), but plaintiff LLC otherwise conducted business somewhat informally. When plaintiff's lease income was insufficient to pay its bills, Cowan simply asked each member to deposit one-seventh of the amount of each bill into plaintiff's bank account; he did not initially seek authorization to make formal capital calls to obtain funds. Plaintiff's attorney eventually advised that capital calls should be made when additional funds were needed. According to Cowan, the money that plaintiff already had received from members at that point was treated as having been contributed voluntarily, and those contributions were then credited toward formal capital calls that plaintiff made later.

Around the time that plaintiff was formed, OPB determined that it no longer could accommodate Chackel's broadcasting equipment on its tower. OPB also needed to increase its tower's height to comply with new federal regulations and, in association with that effort, had to obtain a conditional use permit. Because Chackel already was working on an application for a conditional use permit, it and OPB decided to coordinate their permitting efforts. At about the same time, defendant sought to construct a new wireless-telecommunications tower. Although a conditional use permit was not required for that kind of tower, defendant did need to obtain a building permit from the City of Bend, and it applied for one in late 2001. As events progressed, it became clear that all seven LLC members contemplated either building new towers or expanding their existing towers at some point. Five member representatives met with a City of Bend official, who informed them that the city did not want to review seven individual applications related to the Awbrey Butte site. Rather, the city asked the members to submit a "master plan" setting out proposed development of the entire tower site over a 10-year period. Consistently with that request, the city denied defendant's building-permit application. In short, the city would not accept an application from any member until a master plan was submitted.

With the exception of defendant, the members concluded that, because the city was requiring a master plan that affected all members' interests, it was appropriate for plaintiff LLC to develop and submit the plan. Defendant objected, arguing that the master plan pertained only to the conditional use permits that were necessary for the other members' broadcast facilities, but not for its wireless-telecommunications tower. Nonetheless, the other members agreed to go forward with the master plan and to have plaintiff pay related legal and engineering expenses. Neither the decision to develop the master plan nor the authorization for plaintiff to expend funds was submitted to a formal vote until after the plan already had been developed and submitted to the city in December 2002.

Over the next several years, plaintiff incurred significant expenses in connection with the master plan. To cover those expenses, plaintiff made a series of capital calls between 2003 and 2007 that totaled nearly $67,000 per member. With the exception of defendant, the members voted in favor of the resolutions authorizing those calls, with only defendant voting against each resolution. Defendant paid some requested amounts but refused to pay expenses associated with the master plan.

Plaintiff eventually brought this action, seeking to recover the capital contributions that defendant had not paid. At trial, defendant argued that the capital calls were improper for both procedural and substantive reasons—procedural because the associated expenditures had not been approved in advance by a vote of at least 75 percent of the members, as required by the operating agreement; substantive because the calls (1) were intended to cover legal and engineering costs incurred by individual members for their own benefit and (2) constituted illegal "distributions in kind" to individual members.[2] Plaintiff countered that the calls and associated expenses were proper because they benefited plaintiff as well as each of the individual members. With

---

[2] Defendant raised other arguments that are not pertinent to the issues we discuss on appeal.

respect to defendant's procedural objection, plaintiff conceded in closing argument that some of the expenditures at issue had been made without prior authorization, but it argued that its LLC's members had ratified the expenditures by subsequently approving them through a formal vote.

During its closing argument, defendant noted that plaintiff had not previously raised a ratification theory. Defendant's counsel requested a few days in which to submit a memorandum on the issue, which the court granted. In its post-trial memorandum, defendant asserted that it had been "improper for plaintiff to raise this issue only in closing, without defendant having had an opportunity to put on evidence to rebut it." On the merits, defendant asserted that plaintiff could not rely on the members' ratification of the expenditures to bind defendant to those decisions.

The trial court issued its decision from the bench. The court found it significant that the city, not plaintiff, had wanted the tower development proposals to be submitted as a master plan rather than individually. It found that "the parties [were] working together on a cooperative effort to accomplish a goal for the use of the property" and concluded that their activities fell within the terms of the operating agreement. The court expressed no view on plaintiff's argument that the members had remedied any procedural problems by ratifying all of the expenditures in question. However, the court observed that much of plaintiff's business had been conducted informally, that defendant had participated in that way of doing business, and that defendant "in fact went along with many of the capital calls, except for what [its representative] didn't deem appropriate * * *." The court concluded that, because defendant had "go[ne] along with" the informal process and "ratified many of the capital calls along the way," defendant could not now assert that it owed no money because the capital calls had been procedurally defective. Having determined that the capital calls were appropriate, the court entered judgment for plaintiff in the amount of $51,310.28, and it subsequently entered a supplemental judgment awarding plaintiff attorney fees.

On appeal, defendant makes four assignments of error. First, it argues that the court erred in awarding plaintiff attorney fees. Second, it assigns error to the court's consideration of, and reliance on, ratification as a basis for its decision on plaintiff's claim. Third, it challenges the court's conclusion that plaintiff has standing to bring this action. Finally, defendant assigns error to the court's decision on the merits of plaintiff's claim, contending that the court erred in finding that the capital calls at issue were legitimate. We address the assignments of error in reverse order, save the third, concerning plaintiff's standing, which we reject without discussion.

In the fourth assignment of error, defendant raises several challenges to the trial court's ultimate finding regarding the propriety of the capital calls. We reject most of those arguments without discussion—including defendant's contention that the trial court erred in finding that the underlying master-plan expenditures fell within plaintiff LLC's purposes as set forth in its operating agreement—and address only two in this opinion: (1) defendant's contention that the capital calls were invalid because they improperly granted personal benefits to individual LLC members; and (2) the argument that those capital calls were illegal "distributions in kind" to individual members.

In support of its "improper personal benefit" argument, defendant first asserts that the master-plan expenditures did not benefit plaintiff. The trial court implicitly rejected that argument, and evidence in the record supports the court's implicit findings. *See McClory*, 45 Or App at 563. Cowan testified that expenditures supporting the master plan allowed the members to further develop the property, increasing its value. Given that plaintiff owns the property, Cowen's testimony supports the finding that the expenditures benefitted plaintiff.

Defendant also suggests that the expenditures were illegitimate because they benefitted only the members that sought conditional use permits and did not benefit defendant. We need not address the premise on which defendant's argument appears to be based—that an LLC's expenditures must

benefit *each* of its members—because, even assuming that premise is sound, evidence in the record supports the trial court's implicit finding that all of plaintiff's members did benefit from the expenditures in question. DeChant testified that the master plan benefitted each of the members by allowing them to obtain the permits necessary to construct or expand their respective towers. Indeed, defendant's president testified that defendant's initial building permit applications were rejected because the City of Bend would not consider them without a master plan for the site. That evidence adequately supports a finding that the expenditures benefitted all of the members, including defendant, not just those who needed conditional use permits. We reject defendant's contrary argument.

As noted above, defendant also argues that the master-plan expenditures constituted illegal "distributions in kind" to other members. That argument is premised on defendant's contention that expenditures on the master plan benefitted only some of the LLC members and not plaintiff LLC itself. That premise cannot withstand our conclusion that the record supports the trial court's implicit findings that the expenditures benefitted both plaintiff and each of its members, including defendant. Accordingly, we reject defendant's argument without further discussion.

We turn to the second assignment of error, in which defendant challenges the trial court's reliance on ratification as a basis for its decision on plaintiff's claim. Defendant contends that ratification does not apply under the circumstances of this case for a variety of reasons. Defendant's arguments are unavailing because they challenge only a theory that plaintiff presented to the trial court, not the theory on which the court actually based its ruling in plaintiff's favor. In its closing argument, plaintiff asserted that *the LLC*, through votes of its members, had ratified the challenged expenditures after the fact. Defendant's arguments on appeal all relate to that theory. For example, defendant argues that it "cannot be forced by 'ratification' to be personally liable for the unauthorized actions of the other members, even assuming those actions were later 'ratified' by the LLC." But the trial court based its ruling on a different theory altogether—that *defendant* had ratified the expenditures in

question by acquiescing in the informal procedures by which the members had reimbursed plaintiff for all sorts of expenses, including those that defendant acknowledged it should pay. Because the court determined that defendant had ratified the LLC's informal way of conducting business, it did not need to address whether the LLC also had ratified the informal decisions, through a vote of its membership or otherwise. Defendant's arguments do not meaningfully challenge that determination, and, therefore, give us no reason to disturb the trial court's ratification findings.[3]

In sum, none of defendant's arguments provides a basis for reversing the trial court's decision. Accordingly, we affirm the judgment in which the trial court awarded plaintiff $51,310.28, plus costs and interest.

Defendant's remaining assignment of error challenges the trial court's award of attorney fees. In its fee statement, plaintiff argued that it was entitled to attorney fees under both (1) the operating agreement and ORS 20.096, which makes certain contractual attorney-fee provisions reciprocal, and (2) ORS 36.425(5), which describes circumstances under which a party may be entitled to an attorney-fee award following a trial *de novo* that, itself, followed arbitration. The supplemental judgment does not specify on which of those grounds the trial court awarded plaintiff its attorney fees, and plaintiff renews both arguments on appeal. We hold that plaintiff was entitled to an attorney-fee award under ORS 20.096 and the operating agreement. Consequently, we do not address the alternative ORS 36.425 argument.

The operating agreement includes the following attorney-fee provision:

_____

[3] Defendant also challenges the trial court's very consideration of ratification as a basis for its decision on plaintiff's claim, given that issue's late appearance in the litigation. Defendant's argument regarding that timing question is not adequately developed for review, particularly given that it appears to relate to the ratification theory that plaintiff advocated, not to the ratification theory on which the trial court actually based its decision. We reject the argument without further discussion. *Cf. OTECC v. Co-Gen*, 168 Or App 466, 488, 7 P3d 594 (2000), *rev den*, 332 Or 137 (2001) (we "decline to go in search of a substantive argument" where a party "sets forth no meaningful analysis").

> "**10.02  <u>Attorneys' Fees.</u>**  In the event any Member brings an action to enforce any provisions of this Operating Agreement against the Company or any other Member, whether such action is at law, in equity or otherwise, the prevailing party shall be entitled, in addition to any other rights or remedies available to it, to collect from the non-prevailing party or parties the reasonable costs and expenses incurred in the investigation preceding such action and the prosecution of such action, including but not limited to reasonable attorney's fees and court costs."

(Boldface and underlining in original.) Plaintiff acknowledges that this is not a suit in which a "Member brings an action" to enforce the operating agreement and, therefore, that it would not be entitled to attorney fees under the literal language of the agreement. Nonetheless, plaintiff argues, it is entitled to fees under ORS 20.096(1) (2007),[4] which provided:

> "In any action or suit in which a claim is made based on a contract, where such contract specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim, whether that party is the party specified in the contract or not, shall be entitled to reasonable attorney fees in addition to costs and disbursements."

Relying on *Jewell v. Triple B Enterprises*, 290 Or 885, 626 P2d 1383 (1981), plaintiff contends that ORS 20.096 operates to make the operating-agreement fee provision reciprocal in a broad sense, allowing the prevailing party to recover its attorney fees no matter which party sued to enforce the agreement.

Defendant reads ORS 20.096 more narrowly. With respect to a contract providing "if A sues B to enforce this contract and wins, A is entitled to attorney fees," defendant contends that ORS 20.096 makes the attorney-fee provision reciprocal only in lawsuits initiated by party A. That is, in the

---

[4] ORS 20.096 was amended in 2009. Those amendments apply only to actions on contracts in which a judgment was entered on or after June 16, 2009. Or Laws 2009, ch 285, §§ 2, 3(2). Both judgments in this case were entered before June 16, 2009; consequently, the 2009 amendments do not apply. All references to ORS 20.096 in this opinion are to the 2007 version.

"A sues B" situation described in the hypothetical contract, defendant acknowledges that whichever party prevails will be entitled to attorney fees, notwithstanding contract language making fees available only to party A. According to defendant, however, neither party will be entitled to fees in a "B sues A" case because the contract does not provide for fees in that situation, and there is no applicable attorney-fee provision for ORS 20.096 to make reciprocal.

The Supreme Court's decision in *Jewell*, as well as subsequent cases following that opinion, resolve the attorney-fee question in plaintiff's favor. *Jewell* involved a dispute between a barber-school student and the school in which the student had enrolled. After the school terminated him from the program, the student sued, alleging that the termination violated the terms of an enrollment contract between the parties. The student alleged that he was entitled to recover damages including tuition that he already had paid to the school. After he prevailed at trial, the student successfully sought an award of attorney fees.

The case eventually reached the Supreme Court, which considered how an attorney-fee provision in the student's enrollment contract with the school operated in conjunction with ORS 20.096. The contract provided, "The [student] further understands and agrees to pay all costs and charges for attorney fees necessary for the collection of any amount not paid when due." *Jewell*, 290 Or at 887. The Supreme Court framed the issue presented by the case as whether ORS 20.096

"should be construed so that where a contract allows a seller attorney fees if he prevails in an action for collection, the buyer's right to attorney fees should also be limited to an action for collection or should the buyer's right be extended to cover actions for breach by the seller of other provisions of the contract the seller was obliged to perform."

*Id.* at 887-88. After considering the purpose of ORS 20.096, which was directed to the inequality of bargaining power common in commercial transactions, the court adopted "the broader approach," allowing the plaintiff student his attorney fees. *Id.* at 888. Thus, the court held, the student was entitled to recover his attorney fees associated with suing the

school for breach of contract, even though the contract specified that attorney fees would be available only in cases where the *school* incurred attorney fees in an effort to collect money due from a student.

Despite plaintiff's reliance on *Jewell*, defendant has made no effort to distinguish that case from this one. Instead, defendant simply insists that—when a contract says "if A sues B to enforce this contract and wins, then A gets attorney fees"—ORS 20.096 reciprocity entitles party B to attorney fees only if it prevails in contract-enforcement litigation that is initiated by party A, and not if it prevails in any action that it brought itself. Defendant reiterated that position at oral argument, asserting that plaintiff LLC is not reciprocally entitled to attorney fees under ORS 20.096 because the contractual attorney-fee provision speaks only of contract-enforcement actions brought by members of the LLC, and not about similar actions initiated by the LLC. That argument cannot be squared with *Jewell*, in which the Supreme Court held that the plaintiff student—"party B" in that action—was entitled to recover its fees under a contract provision that spoke only of actions initiated by the school.[5]

The courts have not retreated from *Jewell*; to the contrary, more recent appellate decisions confirm that defendant's argument lacks merit. In *Steidlmayer v. Salishan Properties*, 74 Or App 417, 703 P2d 282, *rev den*, 300 Or 333 (1985), we rejected an argument very similar to the one that defendant makes here. The *Steidlmayer* contract (a lease agreement) provided that, if Salishan Properties sued Steidlmayer to enforce "any covenant or condition" of the lease, Steidlmayer would pay Salishan Properties its attorney fees. Steidlmayer sued Salishan Properties for breach of the lease agreement, and the trial court granted summary judgment to Salishan Properties, along with its attorney fees. On appeal, Steidlmayer challenged the attorney-fee award,

---

[5] The contract in this case, unlike the *Jewell* contract, is not "one sided" in the traditional sense; that is, the contract states that attorney fees will be awarded to *whichever* party prevails in a contract-enforcement dispute initiated by a member of the LLC. That distinction between the two contracts does not affect our analysis. The Supreme Court consistently has held that ORS 20.096 applies even to contractual attorney-fee provisions that, by their terms, already are reciprocal in some respects. *Carlson v. Blumenstein*, 293 Or 494, 500 n 3, 651 P2d 710 (1982).

arguing that the action did "not come within the attorney fee provision because 'Salishan [had] brought no suit or action and [was] not attempting to enforce the lease.'" *Id.* at 419. Citing *Jewell*, we rejected Steidlmayer's argument even though it appeared that (unlike in *Jewell*) the result of applying ORS 20.096(1) reciprocity was that the party with the weaker bargaining position ended up paying attorney fees. In short, we held, whenever a party to a contract that includes an attorney-fee provision brings "the *kind* of action" that the attorney-fee provision contemplates, attorney fees are available to the prevailing party under ORS 20.096 and *Jewell*, regardless of who brought the action. *Id.* at 421 (emphasis in original).

Here, the pertinent provision in the LLC's operating agreement describes the availability of attorney fees in association with "an action to enforce any provisions of this Operating Agreement." That is the kind of action that plaintiff initiated when it sought to recover unpaid capital contributions from defendant. Under *Steidlmayer* and *Jewell*, ORS 20.096(1) operated to make attorney fees available to whichever party prevailed in that kind of action, regardless of which party brought the lawsuit. Defendant's contrary argument has no merit.

Affirmed.